# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT AKRON

|  |  |
|---|---|
| In re: | Chapter 13 |
| JOHN C. GORDON, | Case No. 23-50819 |
|  | Judge Alan M. Koschik |
| Debtor. |  |

## RESPONSE IN OPPOSITION TO DEBTOR'S
## OBJECTION TO CLAIM NO. 4-1 OF BYLINE BANK

Byline Bank (the "Byline"), by its undersigned counsel, states as follows for its *Response in Opposition to Debtor's Objection to Claim No. 4-1 of Byline Bank* (the "Response") in response to *Debtor's Objection to Claim No. 4-1 of Byline Bank* [Doc 46] (the "Claim Objection"):

    1.     On February 3, 2025, Byline transmitted to Debtor the attached documents in support of its Claim No. 4-1 (the "Byline Claim") which include **Exhibit 1,** *Loan Agreement* and *Note* each dated May 6, 2013 and executed by John C. Gordon ("Debtor") on behalf of Ultimate Jetcharters, LLC (the "Ultimate Jetcharters Loan"), **Exhibit 2** Debtor's *Unconditional Guaranty* of the Ultimate Jetcharters Loan (the "Unconditional Guaranty"), **Exhibit 3** Certificate of Merger of Ridgestone Bank and Byline Bank dated October 14, 2016 (the "Certificate of Merger") and **Exhibit 4** Payment History reflecting a balance of $2,035,942.73[1] just prior to Debtor's June 14, 2024 petition date (the "Payoff" and together with the Ultimate Jetcharters Loan and Debtor Guaranty, the "Claim Support Records").

    2.     Debtor objected to the Byline Claim on the basis that Byline did not file support

---

[1] The Byline Claim reflects a claim amount of $2,047,395.16. The claim as of October 5, 2023 after application of payment credits was $1,997,021.50. Byline seeks allowance of its claim in the amount of $1,997,021.50.

documents with the Byline Claim. In support of his objection, Debtor cited to *In re Williams*, 622 B.R. 54 (Bankr. N.D. Ill. 2020) which is factually distinguishable from this Bankruptcy Matter. In *Williams* U.S. Bank's claim was disallowed because at the time it filed its claim in that case, it was not yet the assignee of the claim and when it became the assignee, it was time-barred from filing its proof of claim. To the contrary of the facts in *Williams*, as is evidenced by Byline's Certificate of Merger, Debtor's predecessor creditor, Ridgestone Bank, completed a merger with Byline on October 14, 2016, more than ***6.5 years*** prior to Debtor's June 14, 2023 petition date in this Bankruptcy Matter. **Exhibit 3**.

3.      Notably, *Williams* cited *In re Kincaid*, 388 B.R. 610 (Bankr. E.D. Pa. 2008) which also supports allowance of the Byline Claim. *Kincaid* held that "[t]he law is well settled that failure to attach supporting documentation as required by a rule of procedure ***is not grounds for disallowance of a claim as § 502(b) supplies the exclusive basis for claim disallowance.*** Rather where the proof of claim does not adhere to the requirements of Rule 3001 by providing the facts and documents necessary to support the claim, it is not entitled to the presumption of *prima facie* validity." *Id.* at 617 (Bankr. E.D. Pa. 2008). Moreover, *Kincaid* recognized that "[m]ost courts appear to allow the claimants to amend their claims to provide the necessary documentation if they are able to do so." *Id.* at 614 (citing *In re Taylor*, 363 B.R. 303, 310 (Bankr. M.D. Fla. 2007); *Shank*, 315 B.R. 799, 813-14 (Bankr. N.D. Ga. 2004).

4.      Consistent with *Kincaid*, Byline has now submitted to Debtor and this Court its Claim Support Records which establishes by a preponderance of the evidence the validity of its claim in the amount of $1,997,021.50. Debtor has not presented any other bases on which he can rebut the Claim Support Records. Therefore, the Byline Claim should be allowed in the amount of $1,997,021.50.

5.    Debtor further objected to the Byline Claim arguing that Byline impaired the collateral that served as security for the Ultimate Jetcharters Loan, however, Debtor's Claim Objection omitted subsection (F) of Ohio Revised Code 1303.70 which provides:

> (F) A secondary obligor is not discharged under this section if the secondary obligor consents to the event or conduct that is the basis of the discharge, or *the instrument or a separate agreement of the party provides for a waiver of discharge under this section specifically or by general language indicating that parties waive defenses based on suretyship or impairment of collateral*. Unless the circumstances indicate otherwise, consent by the principal obligor to an act that would lead to a discharge under this section constitutes consent to that act by the secondary obligor if the secondary obligor controls the principal obligor or deals with the person entitled to enforce the instrument on behalf of the principal obligor.

(emphasis added).

6.    Pursuant to the terms of Debtor's Unconditional Guaranty and Consistent with Ohio Revised Code, Debtor expressly waived defenses based on the grounds that "lender impaired the collateral." **Exhibit 2**, page 3, section 6.C.5. Therefore, Debtor expressly waived his defenses on impairment grounds as is permitted by the Ohio Revised Code. The Byline Claim should be deemed allowed in the amount of $1,997,021.50 notwithstanding Debtor's alleged impairment claims.

7.    Based on the forgoing and the attached documents, Byline has set forth by a preponderance of the evidence support for the Byline Claim and Debtor's Objection to Claim should be overruled.

WHEREFORE, Byline prays that this court enter an order denying Debtor's Claim Objection and allowing the Byline Claim in the amount of $1,997,021.50.

Dated: February 24, 2025

Respectfully submitted by,

**TAFT STETTINIUS & HOLLISTER, LLP**

By:  */s/ Dov Frankel*
Dov Frankel (0077562)
200 Public Square, #3500
Cleveland, OH 44114
Phone: (216) 241-2838
Facsimile: (216) 241-3707
Email: dfrankel@taftlaw.com

Kimberly Ross Clayton
(Michigan Bar No. P69804)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Phone: (248) 351-3000
Facsimile: (248) 351-3082
Email: kclayson@taftlaw.com

*Counsel to Byline Bank*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2025, a true and accurate copy of the foregoing *Response in Opposition to Debtor's Objection to Claim No. 4-1 of Byline Bank* was filed and served electronically via the Court's CM/ECF System upon those who are registered to receive electronic notice.

By:    */s/Dov Frankel*
Dov Frankel



## LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is dated as of May 6, 2013, by and between ULTIMATE JETCHARTERS, LLC, an Ohio limited liability company having its principal business office at 6060 West Airport Dr., North Canton, OH 44720 (hereinafter referred to as "Borrower") and RIDGESTONE BANK having its principal office at 13925 W. North Ave., Brookfield, WI 53005 (together with its successors and assigns, "Lender").

### RECITALS

Borrower has requested that the Lender grant, provide and fund a SBA Guaranteed Loan (the "Loan") to Borrower in the principal amount of Three Million Seven Hundred Fifty Thousand and NO/100 Dollars ($3,750,000.00) under the terms, provisions, and regulations of the United States Small Business Administration ("SBA") 7(a) loan program.

Lender is willing to provide the Borrower with the Loan pursuant to the terms of the U.S. Small Business Administration Authorization (SBA 7(a) Guaranteed Loan) approved by the SBA on April 9 2013 as SBA Loan No. 610 39050-61 (the "SBA Authorization"), provided that, among other things, the Borrower executes and delivers this Loan Agreement.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE
### DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings indicated for purposes of this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

Section 1.1.    Collateral. The term "Collateral" means collectively (i) the "Collateral" as defined within that particular Aircraft Security Agreement of even date herewith between Borrower and Lender (the "Borrower Aircraft Security Agreement") including, without limitation, the Aircraft described therein (the "Borrower Aircraft"), and (ii) the "Collateral" as defined within that particular Aircraft Security Agreement of even date herewith between DOWW, LLC, an Ohio limited liability company ("DOWW") and Lender (the "Doww Aircraft Security Agreement") including, without limitation, the Aircraft described therein (the "DOWW Aircraft") (the Borrower Aircraft and the DOWW Aircraft may be referred to collectively herein as the "Aircraft").

Section 1.2.    Event of Default. The term "Event of Default" means any of the events set forth in Article 5 of this Agreement.

Section 1.3    Guarantor. The term "Guarantor" means, collectively, John C. Gordon, an individual ("Gordon"), Ultimate Jet, LLC, an Ohio limited liability company ("UJL"), DOWW (limited to interest in DOWW Aircraft), Wooster Ohio Investments, LLC, an Ohio limited liability company, and any other Person who may guarantee the Obligations of the Borrower from time to time.

Section 1.4.    Insolvency Proceedings. The term "Insolvency Proceedings" means, with respect to any Person, any case or proceeding commenced by or against such Person, under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, or any assignment or assignments for the benefit of creditors, formal or informal moratoriums, compositions or extensions with some or all creditors with respect to any indebtedness of such Person.

Section 1.5.    Laws. The term "Laws" means all ordinances, statutes, rules, regulations, orders, injunctions, writs or decrees of any government or political subdivision or agency thereof, or any court or similar entity established by any thereof.

Section 1.6.    Lender Expenses. The term "Lender Expenses" means all expenses or costs incurred by the Lender, except as limited by Section 7.1 hereinbelow.

Section 1.7.    Loan Documents. The term "Loan Documents" means all agreements, instruments and documents, including without limitation, loan agreements, notes, guarantees, mortgages, deeds of trust, subordination agreements, intercreditor agreements, pledges, affidavits, powers of attorney, consents, assignments, landlord and mortgage waivers, opinions, collateral assignments, reimbursement agreements, security agreements, servicing agreements, notices, leases, subleases, financing statements, pledges and all other written matter, whether heretofore, now or hereafter executed by or on behalf of the Borrower or by any other Person in connection with the Obligations, including but not limited to this Agreement, and the SBA Authorization.

Section 1.8.    Obligations. The term "Obligations" means the continuing obligations of the Borrower to pay to the Lender: (a) any and all sums, indebtedness and liabilities now or hereafter due and owing to the Lender under, as a result of or in connection with the Loan and the Loan Documents, and all renewals, refinancings, extensions, substitutions, amendments, restatements, modifications, supplements or replacements thereof, whether direct or indirect, joint or several, absolute or contingent, contemplated or uncontemplated, now existing or hereafter arising, including, but not limited to, all amounts of principal, interest, charges, reimbursements, advancements, escrows and fees; (b) all Lender Expenses; and (c) any indebtedness or liability which may exist or arise as a result of any payment made by or for the benefit of the Borrower, on any of the obligations described in (a) or (b) above being avoided or set aside as a preference under §§ 547 and 550 of the United States Bankruptcy Code, as amended, or under any state law governing insolvency or creditors' rights.

Section 1.9.    Permitted Liens. The term "Permitted Liens" means: (a) liens for taxes, assessments, or similar charges incurred in the ordinary course of business that are not yet due and payable; (b) liens permitted pursuant to the SBA Authorization; (c) liens in favor of the Lender; and (d) subsequently arising liens which are approved by the Lender and the SBA in writing.

Section 1.10. Person. The term "Person" means any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, court, or government or political subdivision or agency thereof.

Section 1.11. Project. The term "Project" means the project to be financed with the Loan proceeds as described in the SBA Authorization.

Section 1.12. <u>Property</u>. The term "Property" means, collectively: (a) any property owned by the Borrower or being leased or used by the Borrower in the operation of its businesses or storage of Collateral including, but not limited to the premises commonly known as 6060 West Airport Dr., North Canton, OH 44720, and any other property leased or used by the Borrower in the operation of its business; (b) any property used for the storage of Collateral; or (c) any other real property that may be pledged by the Borrower, any Guarantor or any other Person as collateral security for the Obligations.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

Borrower makes the representations and warranties set forth in this Article 2 to induce Lender to grant and fund the Loan and to make advances to Borrower thereunder. Borrower acknowledges the Lender's justifiable right to rely upon these representations and warranties.

Section 2.1. <u>Accuracy of Information</u>. All information, reports, and data submitted by or on behalf of the Borrower in connection with the Obligations, or in support thereof, are true, accurate, and complete in all material respects as of the date made and contain no knowingly false, incomplete or misleading statements.

Section 2.2. <u>No Adverse Change</u>. Since the date of the Borrower's application to the Lender for the Loan, there has been no substantial adverse change in the financial condition of the Borrower or Borrower's ability to repay the financing obtained in connection with the Project, including the Obligations. There are no Insolvency Proceedings pending against the Borrower.

Section 2.3. <u>Status.</u> Borrower and each entity Guarantor are validly organized under the Laws of the State of Ohio and their operations and affairs have been validly commenced. Gordon is an individual residing in the State of Ohio. The Borrower's entry into the Loan Documents with the Lender has been validly approved as may be required by any applicable organizational documents and applicable Laws. Neither Borrower nor any entity Guarantor has registered or uses any trade name.

Section 2.4. <u>Compliance With Laws</u>. The Borrower has complied in all material respects with all applicable Laws.

Section 2.5. <u>Child Support</u>. Neither Gordon nor any individual directly or indirectly owning fifty percent (50%) or more of the voting interests in the Borrower is delinquent more than sixty (60) days under the terms of any: (a) administrative order; (b) court order; or (c) repayment agreement, requiring payment of child support.

Section 2.6. <u>Taxes</u>. The Borrower has: (a) filed all federal, state, and local tax returns and other reports which the Borrower is required by Law to file prior to the date hereof; and (b) paid or caused to be paid all taxes, assessments and other governmental charges (including, but not limited to, income taxes, payroll taxes, real estate taxes, and sales taxes) that are due and payable prior to the date hereof.

Section 2.7. <u>Environmental Conditions</u>. The Borrower represents and warrants that: At the time the Borrower submitted the application for the Loan to the Lender, the Borrower was in

compliance with all local, state, and federal Laws ("Environmental Laws") pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum products, or any other pollutant regulated by state or federal law as hazardous to the environment ("Contaminant") and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant whether at the Property or any other location; The Borrower has and will continue to comply with all Environmental Laws; The Borrower (and/or any of its principals) has no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater, other than what was disclosed in any environmental report delivered to the Lender; There are no proceedings pending alleging any violation of any Environmental Laws by the Borrower or in regard to any Collateral.

Section 2.8.    Litigation. Except as set forth within *Schedule 2.8*, there are no bankruptcy or insolvency proceedings involving, or pending lawsuit against, the Borrower or any principal of the Borrower.

Section 2.9.    Business Organization; Ownership. Since the date of the Borrower's application to the Lender for the Loan there has been no: (a) change in the membership or equity ownership of the Borrower (including the number and identity of the members, owners, shareholders, officers, directors, or the percentage of membership or ownership); (b) change in the form of business organization of the Borrower or the Guarantor; or (c) material change in the operation of the Borrower or the Guarantor, including the type of business or affiliation with other businesses, which would render the Borrower or any Guarantor ineligible for SBA assistance.

Section 2.10.    SBA Authorization. All warranties, covenants and representations applicable to the Borrower contained in the SBA Authorization are true, accurate and in full force and effect.

Section 2.11. Permits; Etc. The Borrower has obtained all occupancy permits and business licenses necessary for the use and occupancy of the Property and the ownership of the Aircraft and the lawful operation of its business. The Borrower has secured all necessary approvals or consents required with respect to this transaction by any mortgagor, creditor or other party having a financial interest in the Borrower.

Section 2.12. Suits. There are no legal actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against the Borrower or any Guarantor before any court, governmental or administrative agency or arbitrator except as disclosed to the Lender in writing prior to the date hereof.

Section 2.13. Insurance. The Borrower has obtained all insurance, including hazard insurance, liability insurance, personal property, liquor liability, worker's compensation insurance, life insurance, and such other insurance coverages as may be required in accordance with the terms and conditions of the SBA Authorization, and in amounts and on policy forms acceptable to the Lender.

Section 2.14    Security.    The repayment of the Obligations shall be secured by the Collateral described and as set forth within the Borrower Security Agreement and DOWW Security Agreement, both of even date herewith (collectively, the "Security Agreements"). The Lender is authorized to file such financing statements, assignments, notices and other documents

and instruments with the appropriate governmental authority as it shall deem necessary or appropriate to perfect and continue the perfection of the security interests created herein and by the Security Agreements. The Borrower hereby acknowledges that all of the Collateral is granted to the Lender as security for the repayment of all of the Obligations of the Borrower to the Lender. If any portion of the Obligations remains unsatisfied, the Lender shall retain its security interest in all of the Collateral until the remaining Obligations is paid in full, even if the value of the Collateral far exceeds the amount of Obligations outstanding.

Section 2.15   Subordination/Priority.  The Lender hereby agrees and acknowledges that, except as set forth within the Subordination Agreement between and among Gordon, Lender and UJL dated as of even date herewith, the Lender shall at all times be subordinate to that particular indebtedness set forth within *Exhibit A* attached hereto.

## ARTICLE 3
## AFFIRMATIVE COVENANTS

The Borrower covenants and agrees during the term of this Agreement and while any Obligations are outstanding and unpaid to do and perform each of the acts and promises set forth in this Article 3:

Section 3.1.    Payment. All Obligations shall be paid and performed in full when and as due. All Lender Expenses (as limited by Section 7.1) shall be paid on demand of Lender. The Borrower shall pay all fees required to be paid by the Borrower as set forth in the SBA Authorization. In addition, the Borrower shall pay to the Lender on or before closing of the Loan a SBA guarantee fee in the amount of $102,968.75 or as determined by the SBA.

Section 3.2.    Insurance. Until the full and complete satisfaction of all of the Obligations, the Borrowers shall obtain and maintain all insurance coverages required by the SBA Authorization, which provisions of the SBA Authorization are hereby incorporated herein by reference, including, but not limited to:

Section 3.2.1. Casualty Insurance. The Borrower shall maintain for all of its assets and properties, whether real, personal, or mixed and including but not limited to the Project, the Property, the Collateral, fire and extended coverage casualty insurance in amounts satisfactory to the Lender and sufficient to prevent any co-insurance liability (which amount shall be the full insurable value of the assets and properties insured unless the Lender in writing agrees to a lesser amount), naming the Lender as loss payee with respect to the Project, the Property and the Collateral, with an insurance company and upon policy forms containing standard mortgagee clauses and or loss payee clauses which are acceptable to and approved by the Lender. The Borrower shall submit to the Lender a certificate evidencing the casualty insurance policy and paid receipts evidencing payment of the premiums due on the same. The casualty insurance policy shall be endorsed so as to make it noncancellable unless ten (10) days prior notice of cancellation is provided to the Lender. The proceeds of any insured loss shall be applied by the Lender to the Obligations, in such order of application as determined by the Lender, unless the Lender in its sole discretion permits the use thereof to repair or replace damaged or destroyed Collateral or Property.

Section 3.2.2. <u>Liability And Worker's Compensation Insurance</u>. The Borrower shall maintain public liability and property damage insurance in such amounts, with insurance companies, and upon policy forms acceptable to and approved by the Lender, naming Lender as an additional insured. In addition, the Borrower shall maintain worker's compensation insurance in such amounts, with insurance companies, and upon policy forms acceptable to and approved by the Lender. The Borrower, on request, shall submit to the Lender copies of the liability and worker's compensation insurance policies and receipts evidencing the payment of premiums due thereon or, alternatively, certificates from the insurance companies certifying to the existence of the policies, summarizing the terms of the policies, and indicating the payment of premiums due thereon.

Section 3.2.3. <u>Flood Insurance</u>. If necessary, the Borrower shall maintain for all of its assets and the Project and the Property, whether real, personal, or mixed and including but not limited to the Collateral, flood insurance coverage insurance in an amount satisfactory to the Lender and sufficient to prevent any co-insurance liability (which amount shall be the full insurable value of the assets and properties insured unless the Lender in writing agrees to a lesser amount), naming the Lender as loss payee with respect to the Collateral, with an insurance company and upon policy forms containing standard mortgagee clauses which are acceptable to and approved by the Lender. The Borrower shall submit to the Lender a copy of the flood insurance policy and paid receipt evidencing payment of the premiums due on the same. The flood insurance policy shall be endorsed so as to make it noncancellable unless ten (10) days prior notice of cancellation is provided to the Lender. The proceeds of any insured loss shall be applied by the Lender to the Obligations, in such order of application as determined by the Lender, unless the Lender in its sole discretion permits the use thereof to repair or replace damaged or destroyed Collateral.

Section 3.2.4. <u>Life Insurance.</u> The Borrower shall maintain a life insurance policy in the face amount of at least Two Million and No/100 Dollars ($2,000,000.00) on the life of Gordon and such life insurance policy shall be assigned to the Lender as security for the Obligations pursuant to that particular Collateral Assignment of Life Insurance Policy of even date herewith.

Section 3.3. <u>Environmental Covenants</u>. The Borrower will comply with all Environmental Laws. The Borrower assumes full responsibility for all costs incurred in any clean-up of environmental contamination in connection with any of the Collateral and agrees to indemnify the Lender and SBA against payment of any such costs or expenses. Until full repayment of the Obligations, the Borrower will promptly notify the Lender and SBA if it knows, suspects, or believes: (a) there has been, or may have been a release of a Contaminant in, at, or under the Project and the Property, including groundwater; (b) Borrower is in violation of any Environmental Laws; or (c) Borrower, the Project, the Property, or any Collateral is subject to any investigation or enforcement action by any governmental agency pertaining to any Contaminant on, at, or under the Property, including groundwater, or any Collateral.

Section 3.4. <u>Equal Opportunity.</u> The Borrower shall post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment, and the general public, and shall comply with the requirements of SBA Form 793, Notice to New SBA Borrowers.

Section 3.5.   American Made Products. To the extent feasible, the Borrower shall purchase only American made equipment and products with proceeds of the Loan.

Section 3.6.   Payment Of Taxes. The Borrower shall pay when and as due, all taxes, assessments and charges or levies imposed upon the Borrower, the Property, the Collateral or any of the Borrower's other assets or property or which it is required to withhold and pay over to a taxing authority or which it must pay on its income.

Section 3.7.   Inspections Of Records. The Lender and the SBA shall have the right to call at the Borrower's places of business during normal business hours and upon reasonable written notice to Borrower at intervals to be determined by the Lender or the SBA, before or after an Event Of Default, and without hindrance or delay to: (a) audit, inspect, verify, check and make extracts or photocopies from the records of the Borrower and/or the SBA and other data relating to the Collateral or the Borrower's indebtedness; and (b) appraise the Collateral. The Borrower shall reimburse the Lender and/or the SBA for the entire cost of all of such audits, inspections, verifications, copying, extractions, and appraisals. The Borrower hereby irrevocably authorizes all governmental agencies and authorities to furnish such reports of examinations or any records pertaining to the Borrower to the Lender or SBA upon a request by the Lender or SBA.

Section 3.8.   Further Assurances And Power Of Attorney. The Borrower shall execute from time to time such other and further documents, including but not limited to deeds of trust, promissory notes, security agreements, agreements, assignments, financing statements, and the like which, in the sole opinion of the Lender or the Lender's counsel, may be necessary to perfect, or complete the security interests and liens in the Collateral and the purposes and intentions of the Loan Documents, it being the intention of the Borrower to provide hereby a full and absolute warranty of further assurance to the Lender. If the Borrower fails to execute any such document within five (5) business days of being requested to do so by the Lender, the Borrower hereby appoints the Lender or any officer of the Lender as the Borrower's attorney in fact for purposes of executing such documents in the name, place and stead of the Borrower, which power of attorney shall be considered as coupled with an interest and irrevocable.

Section 3.9.   Advancements. If the Borrower fails to perform any of the affirmative covenants contained in this Article or to protect or preserve the Collateral or the status and priority of the lien of the Lender in the Collateral, the Lender may, in its sole discretion, make advances to perform the same on behalf of the Borrower or to protect or preserve the Collateral. The Borrower shall repay on demand all sums so advanced on the Borrower's behalf, plus all expenses or costs incurred by the Lender, including reasonable legal fees, with interest thereon at the highest rate applicable to any of the Obligations.

Section 3.10. Financial Statements. The Borrower shall keep proper books of account in a matter satisfactory to Lender and shall furnish to the Lender: (a) within one hundred twenty (120) days after the end of each of its fiscal years, year-end financial statements of the Borrower, prepared in accordance with generally accepted accounting principles, and otherwise in a form acceptable to the Lender; (b) within thirty (30) days after the filing, but in no event more than six (6) months after the first filing due date, copies of the Borrower's annual federal tax returns, together with all schedules thereto; (c) by May 15th of each year, current signed and dated personal financial statements of the Guarantor; and (d) within thirty (30) days after the filing, but

in no event more than (6) months after the first filing due date, copies of the annual federal income tax returns of the Guarantor, together with all schedules thereto. The Borrower shall also furnish to the Lender any financial information required pursuant to the SBA Authorization.

Section 3.11. Financial Information. The Borrower shall keep proper books of account in a manner satisfactory to Lender. In addition to the items required in the SBA Authorization and the other Loan Documents, the Borrower shall submit to the Lender such other information respecting the condition or operations, financial or otherwise, of the Borrower as the Lender may request from time to time. The Borrower irrevocably authorizes the Lender to obtain from any and all governmental agencies and departments reports of examinations or any records pertaining to the Borrower.

Section 3.12. Compliance with Laws. The Borrower shall comply in all material respects with all applicable Laws.

Section 3.13. SBA Authorization. The Borrower shall comply with all terms and provisions of the SBA Authorization.

Section 3.14. Locations. The Borrower shall notify the Lender in writing at least thirty (30) days prior to any change in any of its business locations or any changes in the location of any Collateral.

Section 3.15. Maintain Existence. Borrower and each entity Guarantor shall maintain, in good standing, its existence, rights and privileges as a corporation organized under the laws of the State of Ohio and to qualify and remain qualified and in good standing in each jurisdiction in which its present or future operations or the ownership of the Collateral requires such qualification.

Section 3.16. Regulations. The Borrower agrees to fully comply with Section 503 of the Small Business Investment Act, 15 USC 697, and with all regulations promulgated thereunder, as applicable.

Section 3.17. Permits. The Borrower shall maintain all permits and licenses necessary to use and occupy the Property and own the Aircraft and operate its business.

## ARTICLE 4
## NEGATIVE COVENANTS

Borrower covenants and agrees that while any Obligations are outstanding and unpaid not to do or to permit to be done or occur any of the acts or happenings set forth in this Article 4 without the prior written authorization of the Lender, which such authorization shall not be unreasonably withheld, conditioned or delayed; provided that, in no event shall Lender's refusal to authorize such acts or happenings due to SBA requirements or regulations be considered unreasonable:

Section 4.1. No Change Of Name, Merger, Etc. The Borrower shall not change its name or enter into any merger, consolidation, reorganization or recapitalization.

Section 4.2.  No Sale Or Transfer Of Assets. The Borrower shall not sell, transfer, lease or otherwise dispose of any of its assets other than in the ordinary course of the Borrower's business.

Section 4.3.  No Encumbrance Of Assets. The Borrower shall not mortgage, pledge, grant or permit to exist a security interest in or lien upon any of its assets of any kind, now owned or hereafter acquired, except for Permitted Liens or as otherwise permitted hereunder.

Section 4.4.  No Assignment. The Borrower shall not assign or attempt to assign this Agreement.

Section 4.5.  No Ownership Changes. There shall be no transfer of any ownership interest, equity interests or shares of stock in Borrower from the ownership, shareholder or equity interests existing as of the date of this Agreement.

Section 4.6.  Distributions. The Borrower shall not make any distribution or pay any dividend to any Person that would adversely affect the financial condition of the Borrower.

Section 4.7.  Additional Debt. The Borrower shall not incur any additional debt for borrowed money in an amount not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) in the aggregate.

ARTICLE 5
EVENTS OF DEFAULT

The occurrence of any of the following events shall constitute Events of Default and shall entitle the Lender to exercise the Lender's rights and remedies set forth in and under Article 6 of this Agreement.

Section 5.1.  Failure To Pay Or Perform. The failure by the Borrower to pay any amount due and owing to Lender within five (5) business days after Lender's delivery to Borrower of written notice that such amounts are due and owing or to perform any other Obligations hereunder, which failure is not cured within thirty (30) days after Lender's delivery to Borrower of written notice such non-performance.

Section 5.2.  Violation Of Covenants; Failure Of Conditions Precedent. The failure by the Borrower to perform any of the covenants or agreements provided in this Agreement or a violation of any of the covenants or agreements provided in this Agreement or in any of the other Loan Documents, which failure and/or violation is not cured within thirty (30) days after Lender's delivery to Borrower of written notice such non-performance.

Section 5.3.  Representation Or Warranty; Certifications. The failure of any representation or warranty made by the Borrower to be true in any material respect, as of the date made, or if any of the certifications made by the Borrower to the Lender in the Borrower Certification of even date herewith are not true or become not true, which failure and/or violation is not cured within thirty (30) days after Lender's delivery to Borrower of written notice such non-performance.

C:\Documents and Settings\lloftis\Local Settings\Temporary Internet Files\Content.Outlook\UGXRCEE4\LOAN AGMT 5-3-13 TAL CLEAN (2).doc

9

Section 5.4.   Default Under Security Documents. A breach of or default by the Borrower under the terms, covenants, and conditions set forth in the SBA Authorization or any other Loan Document.

Section 5.5.   Judgments. The Borrower or any Guarantor having entered against any of them final judgments for the payment of money and shall not discharge the same within a period of thirty (30) days.

Section 5.6.   Levy By Judgment Creditor. A judgment creditor of the Borrower or any Guarantor obtaining possession of any of the Collateral by any means, including but not limited to levy, distraint, replevin or self-help.

Section 5.7.   Failure To Pay Debts. The Borrower failing to pay any debt due any third Person and such failure continuing beyond any applicable grace period, unless the Borrower holds a reasonably good faith defense to payment and has set aside reasonable reserves for the payment thereof.

Section 5.8.   Involuntary Insolvency Proceedings. The institution of involuntary Insolvency Proceedings against the Borrower.

Section 5.9.   Voluntary Insolvency Proceedings. The commencement by the Borrower of Insolvency Proceedings.

Section 5.10. Insolvency Proceedings Pertaining To Guarantors. The occurrence of any of the events listed in Sections 5.8 and 5.9 above to any Guarantor.

Section 5.11. Cross-Default. A default occurs under any other indebtedness incurred by the Borrower or a Guarantor in connection with the Obligations or any other loan from the Lender or any other lender to the Borrower or a Guarantor, and such default is not cured within any applicable grace or cure period.

Section 5.12. Dissolution Of Borrower. The dissolution of the Borrower.

Section 5.13. Default By Guarantor. The death or dissolution of a Guarantor or the failure by a Guarantor to satisfy any obligation imposed upon it in any agreement executed by Guarantor with or for the benefit of the Lender; *provided, however,* that upon the death of a Guarantor, Bank shall not declare a default for forty-five (45) days after such death but shall instead permit Borrower to develop a strategic plan for ongoing operation of the business following such death. At the end of such forty-five (45) day time period, the Bank may, at its reasonable discretion, continue to stay any declaration of default for an additional reasonable period of time to enable Borrower to execute the strategic plan; provided, further, that nothing within this Section 5.13 shall absolve Borrower of any liability for compliance with all provisions of this Agreement or otherwise constitute a bar to declaration by Bank of any other event of default under this Agreement.

## ARTICLE 6
## RIGHTS AND REMEDIES ON THE OCCURRENCE
## OF AN EVENT OF DEFAULT

Section 6.1.  Lender's Specific Rights And Remedies. In addition to all other rights and remedies provided by Law and the Loan Documents, the Lender, on the occurrence of any Event of Default, may:

Accelerate and declare immediately due and payable any or all of the Obligations; and Foreclose or enforce all or any security interests, mortgage interests, deed of trusts, liens, assignments, or pledges created by this Agreement or any other Loan Document.

Section 6.2.  Remedies Cumulative. The rights and remedies provided in this Agreement and in the other Loan Documents or otherwise under applicable Laws shall be cumulative and the exercise of any particular right or remedy shall not preclude the exercise of any other rights or remedies in addition to, or as an alternative of, such right or remedy.

Section 6.3.  Obligations Are Unconditional. The payment and performance of the Obligations shall be the absolute, continuing, joint and several, and unconditional duty and obligation of the Borrower, and shall be independent of any defense or any rights of set-off, recoupment or counterclaim which the Borrower might otherwise have against the Lender, and the Borrower shall pay absolutely all payments required to be made on the Obligations, free of any deductions and without abatement, diminution or set-off other than those herein expressly provided.

## ARTICLE 7
## GENERAL CONDITIONS AND TERMS

Section 7.1.  Lender Expenses. Borrower agrees to pay Lender upon demand the following "Lender Expenses": (i) fees, expenses and disbursements of counsel for Lender, in an amount not to exceed Fifteen Thousand and No/100 Dollars ($15,000.00); (ii) all filing fees and appraisal costs associated with the Aircraft; and (iii) the reasonable fees, expenses and disbursements of counsel for Lender associated with the enforcement of Borrower's obligations hereunder or under the Loan Documents or any such other instrument or document.  Lender shall otherwise remain fully responsible for any and all other all costs, fees and expenses of Lender in connection with (i) the analysis, negotiation, preparation, execution, administration, delivery and termination of this Agreement.  Lender shall bear all other costs and expenses incurred by Lender in connection with (i) the preparation, negotiation and execution of this Agreement, the Loan Documents and any other instrument or document provided for herein or delivered or to be delivered hereunder or in connection herewith, (ii) the preparation, negotiation and execution of any and all amendments to this Agreement, the Loan Documents or any such other instrument or document, and (iii) the filing, recording, re-filing and re-recording of any security document and/or any financing statements required to be delivered and all amendments or supplements to any thereof.  Borrower's foregoing obligations shall survive any termination of this Agreement.

Section 7.2.  Waivers. The Lender at any time or from time to time may waive all or any rights under this Agreement or any other Loan Document, but any waiver or indulgence by the Lender at any time or from time to time shall not constitute a future waiver of performance or exact performance by the Borrower.

Section 7.3.   Binding Obligation. This Agreement shall be binding upon the parties hereto and their successors and assigns.

Section 7.4.   Final Agreement. This Agreement and the Loan Documents contain the final and entire agreement and understanding of the parties, and any terms and conditions not set forth in this Agreement or the Loan Documents are not a part of this Agreement and the understanding of the parties hereto.

Section 7.5.   Amendment. This Agreement may be amended or altered only in writing signed by the party to be bound by the change or alteration.

Section 7.6.   Time. Time is of the essence of this Agreement.

Section 7.7.   Choice Of Law. The laws of the State of Illinois shall govern and be applied to determine all issues relating to this Agreement and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this Agreement and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this Agreement or which occurred or were to occur as a direct or indirect result of this Agreement having been executed.

Section 7.8.   Notices. Any notice required or permitted by or in connection with this Agreement shall be in writing and shall be made by hand delivery, by Federal Express, or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the Lender or the Borrower at the appropriate address set forth below or to such other address as may be hereafter specified by written notice by the Lender or the Borrower. Notice shall be considered given as of the date of the hand delivery, one (I) calendar day after delivery to Federal Express or similar overnight delivery service, or three (3) calendar days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was given as provided herein. If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

> If to the Lender:
> RIDGESTONE BANK
> 13925 West North Avenue
> Brookfield, Wisconsin 53005
> Attn.: SBA Lending Division
> If to the Borrower:
> Ultimate JETCHARTERS, LLC
> 6060 West Airport Dr.
> North Canton, OH 44720
> Attn: John C. Gordon

With a copy to:

TRIMBLE & ASSOCIATES, LTD.
10201 Wayzata Boulevard, Suite 130
Minneapolis, MN 55305
Attn: Tony P. Trimble

Section 7.9.   <u>SBA Loan.</u> The Loan secured by this lien was made under a SBA nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this Agreement, then under SBA regulations:

(a)     When SBA is the holder of the Promissory Note evidencing the Loan, this Agreement and all documents evidencing or securing the Loan will be construed in accordance with federal law.

(b)     The Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. Neither the Borrower nor the Guarantor may claim or assert against SBA any local or state law to deny any obligation of the Borrower or the Guarantor, or defeat any claim of SBA with respect to the Loan or this Agreement.

(c)     Any clause in this Agreement requiring arbitration is not enforceable when SBA is the holder of the Promissory Note secured by this Agreement.

Section 7.10. <u>Waiver Of Trial By Jury</u>. Each party to this Agreement agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by either party hereto or any successor or assign of any party on or with respect to this Agreement or any other Loan Document or which in any way relates, directly or indirectly, to the Obligations or any event, transaction, or occurrence arising out of or in any way connected with the Obligations, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING. The Borrower acknowledges and agrees that this Section is a specific and material aspect of this Agreement and the understandings of the parties.

Section 7.11.   <u>Conditions Precedent</u>. It shall be a condition precedent to Lender's obligations under this Agreement and the other Loan Documents including, without limitation, Lender's obligation to make the Loan, that (i) all Loan Documents are in form and substance acceptable to Lender and have been duly executed and delivered by Lender and Borrower; (ii) originals of all Loan Documents required to be filed with the FAA are delivered to Crowe & Dunlevy, A Professional Corporation at 20 North Broadway, Suite 1800, Oklahoma City, OK 73102-8273, Attn: Bob Kalsu (the "Escrow Agent"), on or prior to the date that the Loan is to be disbursed; and (iii) all other matters are satisfactory to the Lender, Lender's counsel, and the Escrow Agent.

*[Signature Page Follows]*

C:\Documents and Settings\lloftis\Local Settings\Temporary Internet Files\Content.Outlook\UGXRCEE4\LOAN AGMT 5-3-13 TAL CLEAN (2).doc

13

IN WITNESS WHEREOF, the Lender and the Borrower have duly executed this Agreement under seal as of the date first above written. This Agreement may be executed in counterparts.

ULTIMATE JETCHARTERS, LLC

By: _____
Name: _John Gordon_
Title: _Chief Manager_

RIDGESTONE BANK

By: _____
Name: _____
Title: _____

## SCHEDULE 2.8

### EXISTING LITIGATION

Borrower is currently in litigation with a former employee who as asserted wrongful termination on the grounds of discrimination; this matter is presently in settlement negotiations, and Borrower anticipates settling the matter within the next several months for an amount less than Sixteen Thousand and No/100 Dollars ($16,000.00).

# EXHIBIT A

## EXISTING INDEBTEDNESS

(i)    Promissory Note dated January 1, 2012 by Guarantor payable to Subordinating Lender, with original principal balance in the amount of $500,000, and which is to be paid by monthly installments in the amount of $10,623.52 directly to Ultimate Holdings, LLC, an Indiana limited liability company ("UHL") (and paid in full on August 1, 2013), and which relates to that particular Promissory Note by Borrower dated August 11, 2011 in the original principal amount of $500,000, payable to UHL and which is to be paid by monthly installments in the amount of $10,623.52 and paid in full on August 1, 2013 ("UHL Note"), and which UHL Note has been guaranteed by John C. Gordon pursuant to that particular Guaranty dated August 11, 2011 by and between, *inter alia*, John C. Gordon and UHL.

[End of Exhibit A]



U.S. Small Business Administration

# NOTE

| SBA Loan # | PLP 61039050-01 |
|---|---|
| SBA Loan Name | Ultimate Jetcharters, LLC |
| Date | May 6, 2013 |
| Loan Amount | $3,750,000.00 |
| Interest Rate | Prime + 2.50% |
| Borrower | Ultimate JETCHARTERS, LLC, an Ohio limited liability company |
| Operating Company | Ultimate JETCHARTERS, LLC, an Ohio limited liability company |
| Lender | Ridgestone Bank, a Wisconsin state banking corporation |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of
Three Million Seven Hundred Fifty Thousand and No/100 _____ Dollars,
interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3.  PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 5.75% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.50%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SPO 50 10.

Borrower must pay principal and interest payments of $26,328.13 every month, beginning one month from the month this Note is dated; payments must be made on the first calendar day in the months they are due. Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted monthly (the "change period").

The "Prime Rate" is the Prime Rate in effect on the first business day of each month (as published in the Wall Street Journal newspaper) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 rounded up. The adjusted interest rate will be 2.50% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The spread as identified in the Note may not be changed during the life of the Loan without the written agreement of the Borrower. For variable rate loans, the interest rate adjustment period may not be changed without the written consent of the Borrower. Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary, Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date of initial disbursement, 5% of the total prepayment amount.
b. During the second year after the date of initial disbursement, 3% of the total prepayment amount; and
c. During the third year after the date of initial disbursement, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 20.000 years from the date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.

B. Borrower waives all suretyship defenses.

C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F. If any part of this Note is unenforceable, all other parts remain in effect.

G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

N/A

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

ULTIMATE JETCHARTERS, LLC, an
Ohio limited liability company

By: _____

    John C. Gordon, Chief Manager




U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| SBA Loan # | PLP 61039050-01 |
|---|---|
| SBA Loan Name | Ultimate Jetcharters, LLC |
| Guarantor | John C. Gordon, individually |
| Borrower | Ultimate JETCHARTERS, LLC, an Ohio limited liability company |
| Lender | Ridgestone Bank, a Wisconsin state banking corporation |
| Date | |
| Note Amount | $3,750,000.00 |

1.  **GUARANTEE:**

    Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2.  **NOTE:**

    The "Note" is the promissory note dated _____ in the principal amount of

    _____ Three Million Seven Hundred Fifty Thousand and No/100 _____ Dollars.

    from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3.  **DEFINITIONS:**

    "Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

    "Loan" means the loan evidenced by the Note.

    "Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

    "SBA" means the Small Business Administration, an Agency of the United States of America.

4. LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A.  Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B.  Refrain from taking any action on the Note, the Collateral, or any guarantee;

C.  Release any Borrower or any guarantor of the Note;

D.  Compromise or settle with the Borrower or any guarantor of the Note;

E.  Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F.  Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G.  Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H.  Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5. FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6. RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A.  Guarantor waives all rights to:
    1)  Require presentment, protest, or demand upon Borrower;
    2)  Redeem any Collateral before or after Lender disposes of it;
    3)  Have any disposition of Collateral advertised; and
    4)  Require a valuation of Collateral before or after Lender disposes of it.

B.  Guarantor waives any notice of:
    1)  Any default under the Note;
    2)  Presentment, dishonor, protest, or demand;
    3)  Execution of the Note;
    4)  Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
    5)  Any change in the financial condition or business operations of Borrower or any guarantor;
    6)  Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
    7)  The time or place of any sale or other disposition of Collateral.

C.  Guarantor waives defenses based upon any claim that:
    1)  Lender failed to obtain any guarantee;
    2)  Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
    3)  Lender or others improperly valued or inspected the Collateral;
    4)  The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5)   Lender impaired the Collateral;

6)   Lender did not dispose of any of the Collateral;

7)   Lender did not conduct a commercially reasonable sale;

8)   Lender did not obtain the fair market value of the Collateral;

9)   Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10)  The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11)  Lender made errors or omissions in Loan Documents or administration of the Loan;

12)  Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13)  Lender impaired Guarantor's suretyship rights;

14)  Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15)  Borrower has avoided liability on the Note; or

16)  Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7.   DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

8.   SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9.   GENERAL PROVISIONS:

A.   ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B.   SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C.   SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D.   JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E.   DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F.   FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G.   LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H.   ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I.   SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J.   CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10. STATE-SPECIFIC PROVISIONS:

N/A

11. GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12. GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

John C. Gordon, individually



EXHIBIT

tabbies®

**3**

*State of Illinois*
*Department of Financial and Professional Regulation*

*Number* <u>3588</u>                    *Date* <u>October 14, 2016</u>

*Certificate of Merger*

**WHEREAS,** there has been submitted to the Illinois Department of Financial and Professional Regulation ("Department"), Division of Banking, an executed Merger Agreement between Ridgestone Bank, Brookfield, Wisconsin, a Wisconsin banking corporation ("Bank") and Byline Bank, Chicago, Illinois, an Illinois banking corporation ("Resulting Bank"), together with evidence of approval of the Merger Agreement by a majority of the entire Board of each of said corporations; and

**WHEREAS,** the Merger Agreement provides that Bank shall be merged into Resulting Bank in accordance with and pursuant to the provisions of the Illinois Banking Act ("Act") and Resulting Bank shall continue under the charter of Byline Bank, Chicago, Illinois with the name Byline Bank. The main banking premises of the Resulting Bank shall be located at 180 N. LaSalle Street, Chicago, Illinois; and

**WHEREAS,** it appears from the evidence furnished to the Department, on the effective date of the merger the Resulting Bank will have the following capital structure on a pro forma basis as of March 31, 2016; 50,000 shares issued and outstanding of common stock, at a par value of $10.00 per share amounting to $500,000, surplus amounting to $365,777,000 and undivided profits amounting to ($10,459,000); and

**WHEREAS,** the Department is of the opinion and finds that:

    (a)    Resulting Bank meets the requirements of the Act for the formation of a new bank at 180 N. LaSalle Street, Chicago, Illinois, the proposed main banking premises of Resulting Bank;

    (b)    the same matters exist with respect to Resulting Bank which would have been required under Section 10 of the Act for the organization of a new bank;

    (c)    the Merger Agreement is fair to all persons affected;

    (d)    Resulting Bank will be operated in a safe and sound manner; and

**WHEREAS,** there has been filed with the Department a copy of the resolutions of the stockholders of Bank and Resulting Bank, approving the Merger Agreement, in accordance with the provisions of the Act.

**NOW, THEREFORE,** by virtue of the power vested by the Act, the merger of Ridgestone Bank with and into Byline Bank shall be and is hereby effective upon the terms and provisions of the Merger Agreement as of the close of business on the day and year first above written, and Byline Bank is hereby authorized as the Resulting Bank in said merger to continue business as a bank, for a perpetual term unless sooner terminated by due process of law, under the name of Byline Bank, pursuant to and subject to all the provisions of the Act.



IN TESTIMONY WHEREOF, I hereunto subscribe my name and affix the seal of my office, the day and year first above written.

DEPARTMENT OF FINANCIAL AND
PROFESSIONAL REGULATION;
BRYAN A. SCHNEIDER, SECRETARY

DIVISION OF BANKING

Kerri A. Doll

**KERRI A. DOLL**
**Acting Director**



Ultimate Jet LLC
18671-9001 Note - 20 Year 150 Sba Commercial
UCC

65 items: Life-to-date beginning 05/06/2013

| Effective / Posted | Type | Amount | Principal | Interest | Balance | Part or Fee |
|---|---|---|---|---|---|---|
| 10/05/2023 10/05/2023 | 619 - ACH/autopayment | 28,147.28 | 10,001.59 | 18,145.69 | 1,997,021.50 | |
| 09/05/2023 09/05/2023 | 619 - ACH/autopayment | 27,901.70 | 10,271.10 | 17,630.60 | 2,007,023.09 | |
| 08/07/2023 08/07/2023 | 619 - ACH/autopayment | 27,901.70 | 8,723.91 | 19,177.79 | 2,017,294.19 | |
| 07/06/2023 07/06/2023 | 610 - Regular payment | 27,313.81 | 9,924.63 | 17,389.18 | 2,026,018.10 | |
| 06/07/2023 06/07/2023 | 610 - Regular payment | 27,313.81 | 7,828.00 | 19,485.81 | 2,035,942.73 | |
| 05/05/2023 05/05/2023 | 610 - Regular payment | 27,313.81 | 12,525.38 | 14,788.43 | 2,043,770.73 | |
| 04/10/2023 04/10/2023 | 610 - Regular payment | 26,421.86 | 7,172.24 | 19,249.62 | 2,056,296.11 | |
| 03/08/2023 03/08/2023 | 610 - Regular payment | 26,421.86 | 9,286.14 | 17,135.72 | 2,063,468.35 | |
| 02/06/2023 02/06/2023 | 610 - Regular payment | 26,421.86 | 11,007.73 | 15,414.13 | 2,072,754.49 | |
| 01/10/2023 01/10/2023 | 610 - Regular payment | 26,421.86 | 7,656.40 | 18,765.46 | 2,083,762.22 | |
| 12/07/2022 12/07/2022 | 610 - Regular payment | 32,839.39 | 10,802.87 | 14,873.94 | 2,091,418.62 | |
| 11/08/2022 11/08/2022 | 610 - Regular payment | 26,424.63 | 9,047.33 | 17,377.30 | 2,102,221.49 | |
| 10/25/2022 10/27/2022 | 660 - Special payment | 148,313.54 | 148,313.54 | 0.00 | 2,111,268.82 | |
| 10/12/2022 10/12/2022 | 610 - Regular payment | 0.40 | 0.00 | 0.40 | 2,259,582.36 | |
| 10/06/2022 10/06/2022 | 610 - Regular payment | 24,578.31 | 10,908.71 | 13,669.60 | 2,259,582.36 | |
| 09/09/2022 09/09/2022 | 610 - Regular payment | 24,578.71 | 3,788.04 | 20,790.67 | 2,270,491.07 | |
| 08/15/2022 08/15/2022 | 610 - Regular payment | 4.97 | 0.00 | 4.97 | 2,274,279.11 | |
| 07/29/2022 07/29/2022 | 610 - Regular payment | 61,000.00 | 50,839.55 | 10,160.45 | 2,274,279.11 | |
| 07/07/2022 07/13/2022 | 610 - Regular payment | 59,237.75 | 19,665.51 | 39,572.24 | 2,325,118.66 | |
| 03/30/2022 03/30/2022 | 660 - Special payment | 1,184.68 | 1,184.68 | 0.00 | 2,344,784.17 | |
| 03/30/2022 03/30/2022 | 610 - Regular payment | 23,693.59 | 12,547.18 | 11,146.41 | 2,345,968.85 | |
| 02/28/2022 02/28/2022 | 610 - Regular payment | 23,693.59 | 8,776.40 | 14,917.19 | 2,358,516.03 | |
| 02/28/2022 02/28/2022 | 660 - Special payment | 950.95 | 0.00 | 0.00 | 2,367,292.43 | |
| 01/19/2022 | 660 - Special | 5,806.42 | 0.00 | 0.00 | 2,367,292.43 | |

| Date | Description | | | | |
|------|-------------|---|---|---|---|
| 01/19/2022 01/19/2022 01/19/2022 | 610 - Regular payment | 19,019.08 | 10,777.28 | 8,241.80 | 2,367,292.43 |
| 12/28/2021 12/28/2021 | 610 - Regular payment | 27,198.58 | 16,635.63 | 10,562.95 | 2,378,069.71 |
| 11/30/2021 11/30/2021 | 610 - Regular payment | 23,699.60 | 8,932.05 | 14,767.55 | 2,394,705.34 |
| 10/22/2021 10/22/2021 | 613 - User defined reg payment | 24,881.14 | 16,873.56 | 8,007.58 | 2,403,637.39 |
| 10/01/2021 10/01/2021 | 660 - Special payment | 1,184.82 | 1,184.82 | 0.00 | 2,420,510.95 |
| 10/01/2021 10/01/2021 | 610 - Regular payment | 23,696.32 | 14,485.55 | 9,210.77 | 2,421,695.77 |
| 09/07/2021 09/07/2021 | 660 - Special payment | 4,739.61 | 0.00 | 0.00 | 2,436,181.32 |
| 09/07/2021 09/07/2021 | 610 - Regular payment | 23,696.32 | 19,441.03 | 4,255.29 | 2,436,181.32 |
| 08/27/2021 08/27/2021 | 610 - Regular payment | 23,696.32 | 864.45 | 22,831.87 | 2,455,622.35 |
| 06/29/2021 06/29/2021 | 610 - Regular payment | 14,698.54 | 10,423.69 | 4,274.85 | 2,456,486.80 |
| 06/18/2021 06/21/2021 | 625 - User defined reg payment | 9,000.00 | 5,883.60 | 3,116.40 | 2,466,910.49 |
| 06/10/2021 06/10/2021 | 610 - Regular payment | 14,698.54 | 1,480.91 | 13,217.63 | 2,472,794.09 |
| 05/19/2021 05/19/2021 | 625 - User defined reg payment | 9,000.00 | 0.00 | 9,000.00 | 2,474,275.00 |
| 04/14/2021 04/14/2021 | 660 - Special payment | 1,184.86 | 0.00 | 0.00 | 2,474,275.00 |
| 04/14/2021 04/14/2021 | 610 - Regular payment | 38,395.70 | 22,614.92 | 15,780.78 | 2,474,275.00 |
| 03/17/2021 03/18/2021 | 625 - User defined reg payment | 9,000.00 | 0.00 | 9,000.00 | 2,496,889.92 |
| 02/10/2021 02/10/2021 | 610 - Regular payment | 24,763.55 | 15,786.20 | 5,541.66 | 2,496,889.92 |
| 01/27/2021 01/27/2021 | 610 - Regular payment | 23,697.16 | 12,954.58 | 10,742.58 | 2,512,676.12 |
| 12/31/2020 12/31/2020 | 610 - Regular payment | 24,877.60 | 13,751.63 | 11,125.97 | 2,525,630.70 |
| 12/14/2020 12/14/2020 | 610 - Regular payment | 24,877.60 | 0.00 | 24,877.60 | 2,539,382.33 |
| 10/02/2020 10/05/2020 | 613 - User defined reg payment | 23,692.95 | 17,650.65 | 6,042.30 | 2,539,382.33 |
| 09/17/2020 09/17/2020 | 625 - User defined reg payment | 23,691.59 | 12,358.11 | 11,333.48 | 2,557,032.98 |
| 08/20/2020 08/21/2020 | 625 - User defined reg payment | 23,691.59 | 11,898.98 | 11,792.61 | 2,569,391.09 |
| 07/22/2020 07/23/2020 | 625 - User defined reg payment | 23,691.59 | 10,219.30 | 13,472.29 | 2,581,290.07 |
| 06/19/2020 06/23/2020 | 625 - User defined reg payment | 25,579.90 | 15,722.42 | 9,857.48 | 2,591,509.37 |
| 05/26/2020 05/27/2020 | 610 - Regular payment | 22,985.81 | 392.35 | 22,593.46 | 2,607,231.79 |
| 04/01/2020 04/29/2020 | 610 - Regular payment | 25,579.90 | 7,916.05 | 17,663.85 | 2,607,624.14 |

| | | | | | |
|---|---|---|---|---|---|
| 02/27/2020 02/27/2020 | 610 - Regular payment | 26,126.26 | 13,592.86 | 12,533.40 | 2,615,540.19 |
| 02/03/2020 02/03/2020 | 610 - Regular payment | 27,620.43 | 16,584.52 | 11,035.91 | 2,629,133.05 |
| 01/13/2020 01/13/2020 | 610 - Regular payment | 26,305.16 | 1,711.42 | 24,593.74 | 2,645,717.57 |
| 12/12/2019 12/12/2019 | 610 - Regular payment | 26,305.80 | 0.00 | 26,305.80 | 2,647,428.99 |
| 10/09/2019 10/09/2019 | 610 - Regular payment | 26,305.48 | 14,581.69 | 11,723.79 | 2,647,428.99 |
| 09/18/2019 09/18/2019 | 610 - Regular payment | 17.21 | 17.21 | 0.00 | 2,662,010.68 |
| 09/18/2019 09/18/2019 | 610 - Regular payment | 26,672.31 | 14,736.88 | 11,935.43 | 2,662,027.89 |
| 08/28/2019 08/29/2019 | 610 - Regular payment | 26,689.52 | 5,434.01 | 21,255.51 | 2,676,764.77 |
| 07/22/2019 07/22/2019 | 610 - Regular payment | 26,689.52 | 5,064.71 | 21,624.81 | 2,682,198.78 |
| 06/19/2019 06/19/2019 | 610 - Regular payment | 26,672.31 | 0.00 | 26,672.31 | 2,687,263.49 |
| 05/01/2019 05/01/2019 | 619 - ACH/autopayment | 26,672.31 | 8,943.82 | 17,728.49 | 2,687,263.49 |
| 04/01/2019 04/01/2019 | 619 - ACH/autopayment | 26,672.31 | 10,063.96 | 16,608.35 | 2,696,207.31 |
| 03/04/2019 03/04/2019 | 619 - ACH/autopayment | 26,259.85 | 7,818.92 | 18,440.93 | 2,706,271.27 |
| 05/06/2013 05/06/2013 | 310 - New note | 0.00 | 0.00 | 0.00 | 0.00 |